## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MARK MCKIBBIN, derivatively on behalf of Nominal Defendant, NEXTERA ENERGY, INC.<br><br>Plaintiff,<br><br>v.<br><br>JOHN W. KETCHUM, JAMES ROBO, ERIC SILAGY, DAVID P. REUTER, NICOLE S. ARNABOLDI, SHERRY S. BARRAT, JAMES L. CAMAREN, KENNETH B. DUNN, NAREN GURSAHANEY, KIRK S. HACHIGIAN, AMY B. LANE, DAVID PORGES, JOHN A. STALL, DARRYL L. WILSON, RUDY E. SCHUPP, JOHN L. SKOLDS, and LYNN M. UTTER,<br><br>Defendants,<br><br>and<br><br>NEXTERA ENERGY, INC.,<br><br>Nominal Defendant. | Case No. _____<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>Jury Trial Demanded |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Mark McKibbin ("Plaintiff"), by and through his undersigned attorneys, brings

this derivative complaint for the benefit of nominal defendant NextEra Inc. ("NextEra" or the

"Company"), against its Board of Directors (the "Board") and certain of its executive officers

seeking to remedy the Individual Defendants'[1] breaches of fiduciary duties and violations of

federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and

---

[1] The "Individual Defendants" are John W. Ketchum, James Robo, Eric Silagy, David P. Reuter, Nicole S. Arnaboldi, Sherry S. Barrat, James L. Camaren, Kenneth B. Dunn, Naren Gursahaney, Kirk S. Hachigian, Amy B. Lane, David Porges, John A. Stall, Darryl L. Wilson, Rudy E. Schupp, John L. Skolds, And Lynn M. Utter.  Parties are sometimes referred to by their last name.

his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including litigation filings, conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding NextEra, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of NextEra against certain current and former officers and members of the Board for breaches of their fiduciary duties between at least December 2, 2021 and February 1, 2023, and violation of the federal securities laws caused by the issuance of materially false and misleading statements in the Company's 2022 proxy statement filed with the SEC on April 1, 2022 (the "Proxy") and in other public statements that have exposed the Company to massive damages.

2.      With more than $17 billion in annual revenues, NextEra is "the world's largest utility company."[2]  Through its subsidiary, Florida Power and Light Co. ("FPL"), the Company serves over 11 million customers in the State of Florida.

3.      For decades, NextEra and FPL have spent millions on lobbying and election influence at every level of politics in Florida, giving them immense influence over the state's politicians.  Starting in 2021, reports surfaced that FPL made a series of improper political expenditures in violation of state and federal campaign finance laws.

4.      On December 2, 2021, the *Orlando Sentinel* reported that political consultants

---

[2] https://www.nexteraenergy.com/company.html.

enlisted by FPL employed a network of nonprofits to secretly channel funds to "ghost candidates"[3] to disrupt the efforts of legitimate state legislators with unfavorable politics during the 2020 election cycle. [4]  Later reports alleged FPL spied on journalists that published unfavorable reports and improperly courted public officials with job offers.   For more than a year thereafter, NextEra and FPL's executives, including the Individual Defendants, falsely claimed and allowed others to claim that the political misconduct orchestrated by FPL did not expose the Company to any meaningful legal or reputational risk.  They based this conclusion in part on the findings of an internal Company investigation.

5.     On January 25, 2023, however, FPL's President and CEO, Eric Silagy, resigned and NextEra filed a Form 8-K with the SEC specifically acknowledging that FPL faced legal and reputational risks because of the allegations that FPL executives had orchestrated political misconduct. The Form 8-K stated in relevant part:

> FPL's and [NextEra's] business and reputation could be adversely
> affected by allegations that FPL or [NextEra] has violated laws, by
> any investigations or proceedings that arise from such allegations,
> or by ultimate determinations of legal violations. For example,
> media articles have been published that allege, among other things,
> Florida state and federal campaign finance law violations by FPL.

6.     On this news, NextEra's stock dropped $7.31 per share, or about 8.7%, representing a loss of approximately $15 billion in market capitalization on unusually high trading volume.

7.     From at least December 2, 2021, through February 1, 2023, the Individual

---

[3] "Ghost candidates" refers to ostensive candidates who pretend to run for office without actually intending to do so, as part of a scheme to confuse voters typically affiliated with one political party and siphon votes away from the *bona fide* candidate of that party, in an effort to enable the candidate of the opposing party to win the elections. *See* https://www.orlandosentinel.com/2021/07/29/pacs-behind-ghost-candidates-in-key-senate-races-were-run-out-of-business-lobbying-groups-hq-records-show/ (last visited August 15. 2023)

[4] https://www.orlandosentinel.com/2021/12/02/florida-power-light-execs-worked-closely-with-consultants-behind-ghost-candidate-scheme-records-reveal-special-report/ (last visited August 15. 2023).

Defendants intentionally or recklessly made and/or permitted the dissemination of materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failing to disclose that: (1) FPL's political misconduct exposed NextEra to substantial legal and reputational risk; and (2) the Company and the Individual Defendants did not maintain adequate internal controls; and (3) in light of the above, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.      As a result of the foregoing, a securities class action was filed against the Company and Defendants James Robo ("Robo"), Silagy, and David P. Reuter ("Reuter") captioned *Jastram v. NextEra Energy, Inc., et al.*, 9:23-cv-80833-AMC (S.D. Fla.) (the "Securities Class Action"). The Securities Class Action has exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

10.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.      In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as NextEra is incorporated within this District.

## PARTIES

*Plaintiff*

14.     Plaintiff is, and has been at all relevant times, a shareholder of NextEra.

*Nominal Defendant*

15.     Nominal Defendant NextEra is incorporated under the laws of the State of Florida, with its principal executive offices located in Juno Beach, Florida.

*The Individual Defendants*

16.     John W. Ketchum has served as a director of the Company since March 2022 and Chairman since July 2022.  He has also served as chairman of FPL since February 2023. Prior to his succession to the role of chief executive officer, he served as president and chief executive officer of NextEra Energy Resources, LLC, the Company's competitive energy supplier subsidiary and the world's largest generator of renewable energy from the wind and sun and a world leader in battery storage.  Mr. Ketchum joined NextEra in 2002 and has a diverse business, finance and legal background with a broad range of experiences across key executive roles and NextEra, NextEra Energy Resources and NextEra Energy Partners, LP ("NEP").  Mr. Ketchum is chief executive officer and a director of NEP, a publicly-traded growth-oriented limited partnership formed by NextEra to acquire, manage and own contracted clean energy projects. According to the Company's public filings, Ketchum was paid $1,400,000 and $1,500,000 in 2021 and 2022, respectively.

17.     Eric Silagy was FPL's Chief Executive Officer ("CEO") from May 2014 until February 15, 2023 and he resigned from FPL effective May 15, 2023.

18.     James Robo became the Company's CEO in July 2012 and Chairman of the Board in December 2013. Robo retired from both positions on March 1, 2022.

19.     David P. Reuter was the corporate spokesperson for FPL during the relevant time-period.

20.     Nicole S. Arnaboldi has served as a director of the Company since October 2022. According to the Company's public filings, Arnaboldi was paid $85,161 for her service on the Board in 2022, which began in October 2022.

21.     Sherry S. Barrat has served as a director of the Company since 1998.  According to the Company's public filings, Barrat was paid $341,493 and $371,435 by the Company in 2021 and 2022, respectively.

22.     James L. Camaren has served as a director of the Company since 2002. According to the Company's public filings, Camaren was paid $311,493 and $339,435 by the Company in 2021 and 2022, respectively.

23.     Kenneth B. Dunn has served as a director of the Company since 2010. According to the Company's public filings, Dunn was paid $341,493 and $355,435 by the Company in 2021 and 2022, respectively.

24.     Naren Gursahaney has served as a director of the Company since 2014. According to the Company's public filings, Gursahaney was paid $334,878 and $370,435 by the Company in 2021 and 2022, respectively.

25.     Kirk S. Hachigian has served as a director of the Company since 2013. According to the Company's public filings, Hachigian was paid $331,493 and $357,435 by the Company in 2021 and 2022, respectively.

26.     Amy B. Lane has served as a director of the Company since 2015. According to the

6

Company's public filings, Lane was paid $338,493 and $367,435 by the Company in 2021 and 2022, respectively.

27.     David Porges has served as a director of the Company since February 2020. According to the Company's public filings, Porges was paid $319,493 and $343,435 by the Company in 2021 and 2022, respectively.

28.     John A. Stall has served as a director of the Company since May 2022. Stall previously served in numerous leadership roles at NextEra before retiring in 2010.  According to the Company's public filings, Stall was paid $226,054 by the Company in 2022.

29.     Darryl L. Wilson has served as a director of the Company since 2018.  According to the Company's public filings, Wilson was paid $321,493 and $340,435 by the Company in 2021 and 2022, respectively.

30.     Rudy E. Schupp served as a director of the Company at all relevant times until his retirement in May 2023.  According to the Company's public filings, Schupp was paid $319,493 and $361,435 by the Company in 2021 and 2022, respectively.

31.     John L. Skolds served as a director of the Company at all relevant times until his retirement in May 2023. According to the Company's public filings, Skolds was paid $341,493 and $362,435 by the Company in 2021 and 2022, respectively.

32.     Lynn M. Utter served as a director of the Company from November 2021 until May 2022.  According to the Company's public filings, Utter was paid $325,493 and $325,493 by the Company in 2021 and 2022, respectively.

*Non-Parties*

33.     Non-party Dev Stahlkoph ("Stahlkopf") was appointed to the Board in May 2023.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

34.     The "Director Defendants" are Defendants Ketchum, Arnaboldi, Barrat, Camaren, Dunn, Gursahaney, Hachigian, Lane, Porges, Stall, and Wilson.

35.     By reason of their positions as officers and/or directors of NextEra, and because of their ability to control the business and corporate affairs of NextEra, the Director Defendants owed NextEra and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NextEra in a fair, just, honest, and equitable manner. The Director Defendants were and are required to act in furtherance of the best interests of NextEra and its shareholders.

36.     Each director and officer of the Company owes to NextEra and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.     The Director Defendants, because of their positions of control and authority as directors and/or officers of NextEra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of NextEra were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Director Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of NextEra, the absence of good faith on their part, or a

reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Director Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of NextEra were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of NextEra were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida and the United States, and pursuant to NextEra's own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how NextEra conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of NextEra and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NextEra's operations would comply with all applicable laws and NextEra's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.     The Director Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NextEra.

43.     At all times relevant hereto, the Director Defendants were the agents of each other and of NextEra and were at all times acting within the course and scope of such agency.

44.     Each of the Director Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## NEXTERA'S CODE OF CONDUCT

45.     NextEra's Code of Business Conduct and Ethics (the "Code of Conduct") applies to all the Individual Defendants.

46.     The Code of Conduct states:

> Violations of our Code, values, policies or the law may carry serious consequences for the individuals involved, as well as for NextEra Energy as a whole. Those engaging in unethical or illegal behavior, and those who direct, condone, approve, or facilitate such behavior, may be subject to legal action and disciplinary action, up to and including termination. It is this sort of behavior that puts all of us at risk of a damaged reputation, negatively affects our stakeholders and may subject us to fines and civil or criminal liability.

47.     In a section titled "Investigations and Consequences," the Code of Conduct states, in relevant part:

> NextEra Energy strives to apply consistent principles when conducting investigations. When a report is made through one of the Hotlines, the information is forwarded to the proper resource for investigation. Our Company will promptly, discreetly, and professionally follow up on any indication of a breach of the law or this Code. Those who make reports to the Code of Business Conduct & Ethics Hotline will receive a case number. This number enables you to check on the status of the investigation. You may be asked to provide additional information and will be notified when an investigation is completed. This is all done to the extent practicable under the circumstances.

48.     In a section titled "Legal Responsibilities," the Code of Conduct states, in relevant part:

> Regardless of title, position or tenure, you have a duty to know and strictly follow this Code, the law, and all Company policies. Additionally, you must know and follow the laws and regulations that apply to the work you do and the places where we do business – whether they are in or outside of the United States. Where you are unclear about the meaning or importance of a section of this Code, you should not hesitate to ask questions. You must certify, on an annual basis, that you have read and understand our Code.

49.     In a section titled "We Observe Securities Laws," the Code of Conduct states, in relevant part:

> In the course of your work, you may become aware of information about our Company (or other companies) before the general public hears about it. It is important that you never disclose, or use for your personal benefit, any material, non-public (or "inside") information you possess.
>
> Material, non-public information comes in various forms. Generally, it is information that a reasonable investor would consider important when making an investment decision, like buying or selling stock. Alternatively, you might not think of information as "public" until after the close of business on the first trading day following the date of public disclosure of the information.
>
> Trading on material, non-public information is a violation of insider trading laws, which can subject the individuals involved to disciplinary action up to and including termination, as well as to potential civil and criminal penalties.

50.     In a section titled "Personal Relationships," the Code of Conduct states, in relevant part:

> "A conflict of interest can arise if you or any related person has a personal stake in a company that is a customer, business partner, or a competitor of NextEra Energy. A related person includes your spouse, civil partner, parents, children, siblings, stepparents, mothers- in-law and fathers-in-law, sons-in-law and daughters-in-law, any person living in the same house with you, any business associate of yours, and anyone who is a close personal friend of yours."

51.     In a section titled "We Exchange Business Courtesies Ethically," the Code of Conduct states, in relevant part:

> At NextEra Energy, we win business based on the quality of our offerings – not our ability to be swayed by business courtesies or favors. To preserve our upstanding reputation, you must use caution when giving or accepting gifts or entertainment. You should not exchange business courtesies with an existing or potential supplier, contractor, vendor, business partner, or customer if the intent is to elicit an unfair business advantage for NextEra Energy.
>
> "Gifts" are usually goods and services but can be defined as any item of value. For example, when the person offering a meal or entertainment is not attending the meal or event, it is considered a gift.

"Entertainment" is generally defined as a situation where both a representative from the provider and the recipient are present.

52.     In a section titled "We Do Not Resort to Corruption or Bribery," the Code of

Conduct states, in relevant part:

As part of our commitment to winning business the right way, NextEra Energy will never tolerate bribery in any form. Even if we lose business or encounter delays because of our refusal to do so, we will never bribe any third party, or allow or condone third parties to do so on behalf of NextEra Energy. We believe in ethically winning business through the quality of our products and services, never through bribery. We abide by laws, treaties, and regulations that forbid bribery, including the U.S. foreign Corrupt Practices Act. To be a responsible member of our business community, you must follow these laws wherever you do business, regardless of local law or custom. This means you may not offer, attempt to offer, authorize, or promise any sort of bribe or kickback for the purpose of obtaining or retaining business or an unfair advantage. Moreover, you may not solicit or accept a bribe…

It is also important to note that you may not hire a third party to do something that you cannot ethically or legally do yourself. Engaging a third party to indirectly make an improper payment violates not only this Code, but also anti-corruption laws. Before you engage a third party that is anticipated to work with foreign government officials on your behalf, you must complete the Request to Engage an International Business Party form.

53.     The Code of Conduct states further that:

The same rules apply to your participation in political activities. You have the right – and are even encouraged – to individually and voluntarily donate your time and money to the political process. However, your participation may not occur on Company time or at NextEra Energy's expense. This means, for example, that you should never engage with your fellow employees on behalf of a political candidate during the workday or expect to be reimbursed by our Company for your personal political contributions. If you want to use Company property, facilities, time, or funds for political activities, it must be pre-approved as set forth in the table at the end of this section. You must not engage in lobbying activities on behalf of NextEra Energy, without prior consent from the applicable Vice President according to the table that follows. Further, lobbying activities may require disclosure and may be subject to specific rules that are often complicated and subject to change. It is your responsibility to ensure that you are in compliance with the applicable laws.

In most – if not all – states and countries, it is illegal to make contributions

or give gifts to politicians, political parties, or public officials that are intended to influence official actions. Therefore, as described earlier in this Code, NextEra Energy funds may not be used to contribute to any political party, committee, candidate, or holder of any government position unless such contribution is permitted by law and complies with our Company policy. Any contributions of corporate funds or other assets must promote the interests of our Company and be made without regard for private political preferences.

54.     In a section titled "We Communicate Truthfully With The Public," the Code of

Conduct states, in relevant part:

"We always communicate truthfully with the public. At the same time, we are consistent in our messaging and careful to promote our Company's best interests. For this reason, only authorized individuals can speak with the media on NextEra Energy's behalf."

55.     In a section titled "We Compete With Integrity," the Code of Conduct states, in

relevant part:

At NextEra Energy, we believe in competing vigorously, but we never sacrifice our integrity to win business. This means we comply with all applicable antitrust and competition laws, wherever we do business. While they can be complex, these laws are meant to ensure a level playing field and fair competition in the marketplace. In practice, these laws require that we make independent business decisions, never engaging in unfair business practices, scheming with our competitors or making other fraudulent business arrangements.

## ADDITIONAL DUTIES OF THE AUDIT COMMITTEE

56.     NextEra's Audit Committee Charter provides that the committee is vested with

oversight of:

(1) the integrity of the financial statements of the Company; (2) the independent auditor's qualifications and independence; (3) the performance of the Company's internal audit function and independent auditor; (4) the compliance by the Company with legal and regulatory requirements; and (5) the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

57.     The Audit Committee Charter states "[t]he function of the Committee is oversight."

58.     In the section titled "Financial Statement and Disclosure Matters", the Audit

Committee Charter states, the committee will:

> Meet to review and discuss with management and the independent auditor the annual audited financial statements of the Company, including reviewing disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), and recommend to the Board whether such audited financial statements should be included in the Company's Form 10-K.

> Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements (including reviewing disclosures made in MD&A).

> Review major issues regarding accounting principles and financial statement presentations, including any significant changes made in the Company's selection or application of accounting principles and practices, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

> Review and discuss reports from the independent auditor on:

>> Critical accounting policies and practices to be used, as identified to the Committee by the independent auditor. o All alternative treatments of financial information within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

>> Other material written communications between the independent auditor and management, such as any schedule of unadjusted differences and any "management letter" or "internal control letter" issued or proposed to be issued by the independent auditor.

> Review and discuss with management and the independent auditor management's internal control report required to be included in the Company's annual report on Form 10-K, management's assessment of the internal control structure and procedures of the Company for financial reporting, and the independent auditor's opinion on the effectiveness of the Company's internal control over financial reporting.

> Afford the chief financial officer and chief accounting officer open lines of communication to the Committee.

> Discuss with management the earnings releases of the Company, including the use of "pro forma" or "adjusted" non-GAAP information therein, as well as financial information and earnings expectations provided to analysts and rating agencies. This may be done generally through a discussion from time

to time (and need not be in advance of each such release or provision of such guidance) of the types of information to be disclosed and the types of presentations to be made.

Discuss with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

Discuss with management and the independent auditor the effect of off-balance sheet structures on the Company's financial statements.

Discuss with management the Company's policies with respect to risk assessment and risk management.

Review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

Ensure that risks identified from time to time as major risks are reviewed by the Board or a Board Committee.

Discuss with the independent auditor the matters required to be discussed by Auditing Standard No. 16, as amended or supplemented, relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management, and management's response.

Review disclosures made to the Committee about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

59.     In the section titled "Oversight of the Company's Internal Audit Function", the Audit Committee Charter states, the committee will *inter alia* "[r]eview the significant reports to management prepared by the internal auditing department and management's responses."

60.     In the section titled "Compliance Oversight Responsibilities", the Audit Committee Charter states, the committee will -

Afford the individual or individuals with operational responsibility for the compliance and ethics program an open line of communication to the Committee, including the authority to communicate to the Committee (1) promptly on any matter involving criminal conduct or potential criminal conduct, and (2) no less than annually on the implementation and effectiveness of the compliance and ethics program.

Review management reports with respect to the conformity of the Company and its affiliated entities with applicable legal and regulatory requirements. Review compliance with the Company's Code of Business Conduct & Ethics and with the Code of Ethics for Senior Executive and Financial Officers, including review of any violations and waivers of such codes of ethics.

Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

Discuss with the Company's General Counsel legal matters that the General Counsel believes are reasonably possible to have a material impact on the Company's financial statements, internal controls or compliance policies.

## SUBSTANTIVE ALLEGATIONS

61.     In 2019, Silagy, in his capacity as CEO of FPL, hired Matrix LLC ("Matrix") to engage in political activity on behalf of FPL.

62.     FPL diverted corporate resources to support the political efforts coordinated by Matrix during the 2020 election cycle.  During this time, Matrix, on behalf of FPL, surveilled journalists who authored negative stories about FPL and supported non-profit entities that contributed to "ghost candidates" to derail the unfavorable campaign efforts.

63.     In 2021, a lawsuit concerning Matrix connected FPL executives to Matrix's improper political conduct. The *Orlando Sentinel*, *Miami Herald*, and *Floodlight* broke the story in late 2021 and continued to cover it through summer 2022.

64.     On December 2, 2021, the *Orlando Sentinel* published an article linking FPL executives directly to the "ghost candidates" scheme.

65.     The same day, in response to the *Orlando Sentinel's* reporting, FPL spokesperson

Defendant Reuter denied the company had any role in the "ghost candidate" scheme. Specifically, Reuter stated the following:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

66.     On December 17, 2021, the *Orlando Sentinel* published a story revealing the existence of a November 2019 memo from Matrix to Silagy that described how FPL funds could be filtered through shell non-profits to conceal their source.

67.     The same day, when confronted with the November 2019 memorandum by the *Orlando Sentinel*, Defendant Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle." Reuter continued:

> Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501C(4) organizations and we had no knowledge of this structure being used by Matrix. We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020.

68.     On January 25, 2022, Defendant Robo made the following statement on a call with investors and analysts:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got -- when we received the report and those allegations that have been in the press, we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their–they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And so that's kind of the bottom line. And I feel very good about the investigation that we did, and I feel very good

that there is no basis to any of these allegations…

69.     On February 18, 2022, NextEra filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating performance for the year ended December 31, 2021 ("2021 10-K").  The 2021 10-K omitted any warning to investors that FPL's and NextEra's business and reputation could be adversely affected by allegations that FPL or the Company had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

70.     On April 1, 2022, Defendants issued the 2022 Proxy, wherein Defendants solicited shareholder votes in favor of five proposals, including the re-election of Defendants Barrat, Camaren, Dunn, Gursahaney, Hachigian, Ketchum, Lane, Porges, Robo, Schupp, Skolds, Stall, and Wilson and non-binding approval of certain executive compensation.

71.     The 2022 Proxy states Robo served as chairman of FPL until March 2022.  The 2022 Proxy states that NextEra has adopted a Code of Business Conduct & Ethics applicable to all representatives of NextEra Energy and its subsidiaries, including directors…"

72.     The 2022 Proxy states that the "Board has instructed the General Counsel to assist the Board in reviewing all written communications" regarding *inter alia* internal and external complaint, including as they relate to subsidiaries. The 2022 Proxy also notes that the Audit Committee oversees compliance with legal and regulatory requirements as well as "major risks" to the Company but fails to disclose that none of the Board's committees were charged with overseeing subsidiary compliance or specifically with campaign finance compliance in connection with its lobbying activities.

73.     The 2022 Proxy asked shareholders to ratify the compensation paid to the Company's named executive officers, the specifics of which were reflected in the below slide:

| Named Executive Officer | 2021 Target Annual Incentive | 2021 Annual Incentive Award |
|---|---|---|
| James L. Robo | $2,495,000 | $4,992,000 |
| Rebecca J. Kujawa | $ 612,500 | $1,225,000 |
| John W. Ketchum | $ 980,000 | $1,960,000 |
| Eric E. Silagy | $ 980,000 | $1,960,000 |
| Charles E. Sieving | $ 649,560 | $1,299,100 |

74.     In connection with these awards, the 2022 Proxy stated, "in years where the Company's performance is above or substantially above the performance of its peers…as it was in 2021, the Company expects that annual incentive awards will be paid…at a rate exceeding the target rate."   The 2022 Proxy, however, omitted to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to its subsidiaries and campaign finance laws.

75.     The 2022 Proxy also was false and misleading because it failed to disclose the following: (1) contrary to the 2022 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate campaign finance laws, and thus the Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation.

76.     The false and misleading elements of the 2022 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors and the approval of executive compensation.

77.     On April 22, 2022, NextEra filed an Annual Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending on March 31, 2022 ("2022 Q1 10-Q").   The 2022 Q1 10-Q similarly omitted any warning to

investors that NextEra's business and reputation could be adversely affected by allegations that FPL or the Company had violated laws in connection with its lobbying activities.

78.     In the summer of 2022, a series of articles in the *Orlando Sentinel*, the *Miami Herald*, and *Floodlight* further described FPL's alleged surveillance of journalists, use of paid media to attack regulators, and support for a "ghost candidate" challenging a state legislator.

79.     On June 24, 2022, Silagy stated, "I have never authorized or approved or been a party to following [the journalist in question] or any other reporter." When presented with text messages and emails indicating that a private investigator paid by Matrix had followed the reporter while updating Daniel Martell, FPL's Vice President of State Legislative Affairs, Defendant Reuter cast doubt on the authenticity of the records saying FPL had "no digital record of these exchanges and cannot prove their veracity."

80.     On July 27, 2022, NextEra filed an Annual Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period ending on June 30, 2022 ("2022 Q2 10-Q"). The 2022 Q2 10-Q omitted any language warning investors that FPL's and NextEra's business and reputation could be adversely affected by allegations that FPL or NextEra had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

81.     On October 26, 2022, Citizens for Responsibility and Ethics in Washington ("CREW") filed a complaint alleging that the individuals and entities implicated by the ghost candidate scheme violated federal campaign finance law.

82.     On November 3, 2022, NextEra filed an Annual Report on Form 10-Q with the SEC, reporting the Company's financial and operating performance for the three-month period

ending on September 30, 2022 ("2022 Q3 10-Q"). The 2022 Q3 10-Q The 2022 Q1 10-Q similarly omitted any warning to investors that NextEra's business and reputation could be adversely affected by allegations that FPL or the Company had violated laws in connection with its lobbying activities.

83.     On January 25, 2023, NextEra disclosed that Silagy would no longer serve as CEO of FPL as of February 15, 2023 and would retire effective May 15, 2023. NextEra additionally disclosed that Silagy and NextEra had entered into a "confirmation of post-retirement covenants agreement" (the "Severance Agreement") whereby Silagy agreed to, *inter alia*, a release of claims and various restrictive covenants in exchange for payments in the form of incentive awards calculated in accordance with NextEra's annual incentive plan and equity awards consistent with what NextEra characterized as "a normal retirement."

84.     The same day, NextEra filed a Form 8-K with the SEC which specifically acknowledged that FPL faced legal and reputational risks because of the allegations that FPL executives had orchestrated political misconduct. The Form 8-K stated as follows:

> FPL's and [NextEra's] business and reputation could be adversely affected by allegations that FPL or [NextEra] has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL.

85.     Analysts expressly linked NextEra's stock drop to the risks posed by FPL's political misconduct. For example, Paul Patterson of Glenrock Associates said that the stock decline was "driven substantially by the unexpected management change and the update they gave on their review into political activity." A report published by Bank of America analyst Julien Dumoulin-Smith on January 26, 2023 concluded Silagy's exit was "rushed" and difficult to separate from recent political controversies.

86.     On January 31, 2023, the *Florida Times Union* reported that NextEra's executives disclosed that Silagy's exit agreement included a multi-year "claw back on compensation for any legal wrongdoing" acknowledging the link between Silagy's departure and the new risk disclosure statement.

87.     From at least December 2, 2021, and February 1, 2023, the Individual Defendants intentionally or recklessly made and/or permitted the dissemination of materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failing to disclose that: (1) FPL's political misconduct exposed NextEra to substantial legal and reputational risk; and (2) the Company and the Individual Defendants did not maintain adequate internal controls; and (3) in light of the above, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

89.     NextEra is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

90.     Plaintiff is a current shareholder of NextEra and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

91.     At the time this action was commenced, the twelve-member Board was comprised

of the Director Defendants and non-party Dev Stahlkoph (collectively, the "Demand Board"). Accordingly, Plaintiff is only required to show that six members of the Demand Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

92.     As an initial matter, the Company's 2023 proxy statement, filed with the SEC on April 5, 2023, concedes Ketchum, as the current Chairman and CEO, is not independent.

93.     As set forth below, each member of the Demand Board, and if not all at least the eleven Director Defendants, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

94.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the Company to violate the law, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

95.     The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

24

96.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of NextEra, the Director Defendants knew, or should have known, the material facts surrounding NextEra's compliance with campaign finance and securities laws, and the accuracy of its public statements.

97.     The entire Demand Board is subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the members of the Demand Board to also adhere to NextEra's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly allowed the Company to violate the law.  The entire Demand Board violated the Code of Conduct, including by refusing to take action to address the misconduct alleged herein. As such, the entire Demand Board faces a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

98.     The Audit Committee is and was responsible for, *inter alia*, overseeing "the integrity of the financial statements of the Company" and "compliance by the Company with legal and regulatory requirements."  Director Defendants Gurshaney (Chair), Dunn, Stall and Wilson, as members of the Audit Committee breached their fiduciary duties by declining to act in the face of repeated red flags that the Company was deficient in meeting its compliance and reporting obligations. These Director Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

99.     Furthermore, demand in this case is excused because each of the directors derive

substantial revenue from the Company, control the company, and are indebted to each other. Defendants Barrat, Camaren, Dunn, Gursahaney, Hachigian, Lane, Porges, Stall, and Wilson comprised the Board that appointed Ketchum as CEO of the Company and recommended Arnaboldi for election as a director. Further, the 2022 Proxy states that "a NextEra Energy subsidiary has employed Mr. Camaran's son-in-law since 2021 in a non-executive business role…." These and other conflicts of interest have precluded the current directors from calling into question the Director Defendants' conduct or taking any remedial actions to redress the conduct alleged herein. Accordingly, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action due to their close relationship with, and indebtedness to, the Director Defendants named herein.

100. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of NextEra. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of NextEra, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

101.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause NextEra to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

102.    Accordingly, a pre-suit demand on the Demand Board is futile and excused.

### COUNT I
**Against the Director Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

103.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

104.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

105.    Under the direction and watch of the Director Defendants, the 2022 Proxy failed to disclose, *inter alia*: (1) contrary to the Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading

statements, and thus the Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation.

106.    The 2022 Proxy further failed to disclose that the Company was violating campaign finance laws, issuing false and misleading statements in violation of securities laws, and had failed to establish or maintain adequate internal controls. As a result, the 2022 Proxy was materially false and misleading.

107.    In the exercise of reasonable care, these defendants should have known that the statements contained in the Proxy were materially false and misleading.

108.    The misrepresentations and omissions in the 2022 Proxy were material to Company stockholders in voting on the 2022 Proxy. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the Proxy, including but not limited to the reelection of certain Director Defendants and the approval, on an advisory basis, of the compensation of the Company's executives.  The 2022 Proxy was an essential link in defendants' insulation of the awards from stockholder challenge.

109.    The false and misleading elements of the 2022 Proxy led to, among other things, the election of the Defendants Barrat, Camaren, Dunn, Gursahaney, Hachigian, Ketchum, Lane, Porges, Robo, Schupp, Skolds, Stall, and Wilson, which allowed them to continue to breach their fiduciary duties to NextEra.

110.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2022 Proxy.

111.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

<u>**COUNT II**</u>
**Against the Individual Defendants for Breach of Fiduciary Duty**

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

114.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

115.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

116.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

117.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

118.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

119.     Plaintiff on behalf of NextEra has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

120.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NextEra.

121.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from NextEra that was tied to the performance or artificially inflated valuation of NextEra, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

122.     Plaintiff, as a shareholder and a representative of NextEra, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and

breach of their fiduciary and contractual duties.

123.    Plaintiff on behalf of NextEra has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

124.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of NextEra's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

125.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

126.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

127.    Plaintiff on behalf NextEra has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

31

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock

sale proceeds, and imposing a constructive trust thereon;

      C.     Awarding punitive damages;

      D.     Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated: September 6, 2023            ROSCA SCARLATO LLC

           By: */s/ Kathryn Weidner*
                Kathryn Weidner (FL Bar No.0034661)
                Rosca Scarlato LLC
                2255 Glades Road
                Suite 324A
                Boca Raton, FL 33431

                Alan Rosca (OBA 0084100) (*pro hac vice
                forthcoming*)
                Rosca Scarlato LLC
                2000 Auburn Drive
                Suite 200
                Beachwood, OH 44122


                *Attorneys for Plaintiff*

*Of Counsel:*

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
sdr@rl-legal.com
vl@rl-legal.com